Edward C. FORMAN,
Petitioner–Appellee,

v.

Harold J. SMITH, Superintendent, Attica
Correctional Facility,
Respondent–Appellant.

No. 869, Docket 80–2024.

United States Court of Appeals,
Second Circuit.

Argued March 4, 1980.

Decided Oct. 8, 1980.

James L. Kennedy, Asst. Atty. Gen., Buffalo, N. Y. (Robert Abrams, Atty. Gen. and Judith Blake Manzella, Asst. Atty. Gen., Buffalo, N. Y., on brief), for respondent–appellant.

John J. Privitera, Washington, D. C. (Tigar & Buffone, Washington, D. C., on brief), for petitioner–appellee.

Before FEINBERG, Chief Judge, NEWMAN and KEARSE, Circuit Judges.

NEWMAN, Circuit Judge:

The exercise of habeas corpus jurisdiction by a federal district court to assess the validity of a criminal conviction obtained in a state court creates an inevitable tension between two important principles: the observance of constitutional protections in the enforcement of criminal law and the maintenance of appropriate authority within the separate spheres of the state and federal court systems. That tension is especially strained when a petitioner convicted in state court seeks relief from a federal court asserting a constitutional claim that was rejected by the state court system not on its merits, but solely for lack of proper procedural presentation. This case presents that problem in the context of a constitutional

claim raised in the state courts on a collateral attack upon a conviction and rejected because it had been omitted from the issues on direct appeal. Notwithstanding that omission, the District Court for the Western District of New York (John T. Curtin, Chief Judge) considered the claim on its merits, upheld it, and set aside the conviction. *Forman v. Smith*, 482 F.Supp. 941 (W.D.N.Y. 1979). We reverse, concluding that under the prevailing standard announced by the Supreme Court in *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), as applied to the circumstances of this case, the conviction may not be overturned by a federal court.

I.

In the middle of the night of May 15, 1972, Archie Gilliland was shot to death at the home of Edward Forman, the petitioner, and Forman's wife, Florence McClain, in Buffalo, New York. When the police arrived, McClain was present in the home. She confessed to the murder and was arrested and charged with the crime. The police located Forman early the following morning at a house across the street from his residence. He was questioned, but, after denying any knowledge of the shooting, was released.

About a week later, McClain recanted her confession and expressed her belief that her husband had committed the murder. Her story was corroborated by a polygraph test, and by another individual, Willie Harris, who turned in to the police a gun that he stated had been given to him by Forman on the morning after the shooting. McClain was then released, and Forman became the prime suspect. He was arrested four months later by the Buffalo police on three outstanding warrants, two for traffic offenses and one for possession of a dangerous weapon. These warrants were based on prior incidents unrelated to the shooting of Gilliland. While Forman was in custody, he was also charged with hindering the prosecution and tampering with physical evidence in the Gilliland investigation, mainly on the basis of the statement by Willie Harris. He was questioned at this time after being advised of his rights, but refused to answer any questions. The next day, September 20, 1972, he was arraigned on the hindering and tampering charge. At the arraignment hearing, Forman was represented by James Robinson, Jr., a lawyer whom he had retained in connection with the traffic and weapons charges.

Shortly thereafter, both Forman and his wife were indicted for second-degree murder. Following his indictment, Forman was questioned twice during the same evening by several members of the Buffalo police force, including Lt. Leo J. Donovan. On both occasions he was again advised of his rights. During the first round of questioning, Forman denied everything;[1] during the second round, however, he told two different stories: first, that Gilliland had been shot by John Adams; and second, that Gilliland had been shot when a rifle Forman and Adams had been passing between them accidentally discharged. Forman gave no indication during either of these sessions that he was represented by counsel. It was disputed whether Lt. Donovan was present at the arraignment hearing, and whether he knew that Forman had an attorney. Judge Curtin found, after an evidentiary hearing, that Forman was never asked by the officers whether he was represented by counsel, and never volunteered that he was. The Court also found that Lt. Donovan was aware at the time of questioning that Forman had been arraigned on the tampering charge and that he assumed Forman was represented by counsel. *Forman v. Smith, supra*, 482 F.Supp. at 945.

Prior to Forman's trial in state court, a *Huntley* hearing[2] was held to determine the admissibility of Forman's statement to the police. Forman was represented by a

---

1. Before questioning Forman, the police read his rights to him from a form waiver card. Forman did not sign the card.

2. *See People v. Huntley*, 15 N.Y.2d 72, 204 N.E.2d 179, 255 N.Y.S.2d 838 (1965).

second attorney at this hearing;[3] no mention was made of Forman's prior representation by Robinson. The state court ruled that Forman's statement was voluntarily made after a valid waiver of his rights. At trial, the statement was admitted into evidence. Forman testified that his statement to the police was a lie designed to protect his wife, and that Gilliland had been shot by Adams.

A substantial amount of evidence, in addition to Forman's statement, was presented at the trial to prove that Forman had murdered Gilliland. Willie Harris testified, as he had previously told the police, that Forman had given him a rifle on the morning after the shooting. He also testified that Forman had told him that morning that he, Forman, had killed Gilliland. The rifle that Harris had turned in to the police was identified by a ballistics expert as the rifle that had fired the fatal bullet. Another witness, Henry Williams, testified that Forman had offered him fifty dollars to kill Gilliland, that Forman had described the shooting of Gilliland to him, and that Forman had called him from Detroit, threatening to kill him as he had killed Gilliland if Williams cooperated with the police. A boarder at the Forman–McClain residence, Christine Walton, testified that Forman had pointed Gilliland out to her, saying that Gilliland was the man who had previously shot and wounded him and that he, Forman, would try to get even with Gilliland later. She identified the rifle as having been in Forman's possession before the murder, and also testified that, when she

went to sleep at 11:00 on the night of the murder, Forman had been in his house. McClain testified that she had been awakened on the night of the murder by the sound of a gunshot, and saw Forman standing in the hall with a gun in his hand. She also identified the rifle in evidence as Forman's.[4]

The jury returned a verdict of guilty on the charge of second–degree murder against Forman and acquitted his wife. Forman appealed, and the Appellate Division affirmed the conviction without a written opinion. *People v. Foreman* [*sic*], 45 App.Div.2d 820, 358 N.Y.S.2d 353 (4th Dept. 1974). Leave to appeal to the Court of Appeals was denied, and the United States Supreme Court denied Forman's petition for certiorari, 420 U.S. 1007, 95 S.Ct. 1451, 43 L.Ed.2d 765 (1975), ending Forman's opportunity for direct review of his conviction.

Forman then filed his habeas corpus petition in the United States District Court, alleging that admission of his statement violated his Sixth Amendment rights. The parties agreed to stay this proceeding until Forman had exhausted the state remedy available to him under N.Y.Crim.Proc.Law § 440.10 (McKinney 1976) (motion to vacate judgment). Forman then applied under § 440.10 to the state trial court. That court, acting pursuant to § 440.10(2)(c), denied his application, finding that the Sixth Amendment claim was an issue that was not, but could have been, raised on direct appeal.[5] When leave to appeal from that

---

**3.** Since Forman was no longer able to pay for retained counsel, new counsel was appointed by the court. In the habeas proceeding, Forman was represented by a third attorney, who was also appointed.

**4.** After the trial McClain told Forman that her trial testimony had been false. This prompted a state court hearing on a motion for new trial. At the hearing McClain admitted making her statement to Forman, but would not testify whether or not her trial testimony had been truthful. The trial judge denied Forman's motion for a new trial, finding that McClain's recantation to Forman was not truthful and noting that her trial testimony had been corroborated by a polygraph test.

**5.** Because the state court explicitly held that the Sixth Amendment claim was forfeited under state law for failure to present it on direct appeal, we have no occasion to consider whether a state court's rejection of a claim without opinion permits a federal court to make its own examination of state procedural requirements and to conclude that a federal claim has been deemed forfeited. *Cf. Alburquerque v. Bara*, 628 F.2d 767, 773 (2d Cir. 1980) ("it suffices for present purposes to observe that no reasoned, factually substantiated opinion has been rendered by the state courts holding that Alburquerque did not meet the procedural requirements for challenging the method of composing his jury panel").

ruling was denied, the District Court lifted the stay and conducted an evidentiary hearing.

The District Court recognized that the Supreme Court has at different times announced two distinct standards for determining when a claim may be considered in a federal habeas corpus proceeding notwithstanding a state court determination that the claim is no longer available for failure to comply with state court procedures. In *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), the Supreme Court articulated the "deliberate by–pass" test, permitting a federal habeas court to deny relief to a petitioner who has "deliberately by–passed the orderly procedure of the state courts and in so doing has forfeited his state court remedies." *Id.* at 438, 83 S.Ct. at 848. More recently, the Court announced the "cause and prejudice" test, barring a federal habeas court from considering a claim not asserted at trial in compliance with state procedural requirements, "absent a showing of cause for the noncompliance and some showing of actual prejudice resulting from the alleged constitutional violation." *Wainwright v. Sykes,* supra, 433 U.S. at 84, 97 S.Ct. at 2505 (1977). Because of the uncertainty as to which test applied to a claim not presented to the state courts on direct review, the District Court applied both tests in the alternative.

Under *Noia*, Judge Curtin concluded that there had been no deliberate by–pass in the failure to raise Forman's Sixth Amendment claim on appeal. Under *Sykes*, the Court found that there was cause for Forman's procedural default and prejudice resulting from it. The basis for the Court's finding of cause was a statement made by Lt. Donovan at the *Huntley* hearing, which was deemed to be misleading. At that hearing, Donovan had testified that the charges on which Forman had been arrested were unrelated to the murder charge on which he was indicted and questioned. This was literally true; Forman had been arrested on charges of traffic violations and possession of a dangerous weapon, all based on incidents unrelated to the Gilliland shooting.

But Forman was also charged, later on the same day of his arrest, with obstructing the investigation into Gilliland's death. The District Court found this to be significant because Forman was represented by his retained counsel, James Robinson, Jr., at the arraignment hearing on the obstruction charge. Since Forman had retained a lawyer to represent him on a charge related to the Gilliland shooting, under New York law, he could not be questioned about that incident without his retained counsel being present, unless, in the presence of his lawyer, he waived his right to counsel. See *People v. Kaye*, 25 N.Y.2d 139, 143, 250 N.E.2d 329, 331, 303 N.Y.S.2d 41, 45 (1969); *People v. Arthur*, 22 N.Y.2d 325, 329, 239 N.E.2d 537, 539, 292 N.Y.S.2d 663, 666 (1968). Judge Curtin found that Lt. Donovan's testimony "obscured the relationship between the earlier arraignment on hindering and tampering charges, and the later indictment and questioning" and "deflected the focus of the inquiry and prevented development of the record as to Forman's representation by counsel on a related charge at the time of the questioning." 482 F.Supp. at 948. The absence of a record on this point at the trial level, according to the District Court, was the understandable cause for the failure of the new, assigned counsel to raise on direct appeal any state law or Sixth Amendment objection to the admissibility of Forman's uncounseled statement.

The District Court also concluded that the *Sykes* prejudice requirement had been met. Forman's statement, the Court noted, placed him at the scene of the crime, admitted his ownership of the murder weapon, and suggested his involvement, at least to some extent, in Gilliland's death. Consequently, the Court found that both cause and prejudice had been shown, and that Forman had not lost his right to habeas review of his Sixth Amendment claim. The Court then proceeded to the merits of that claim and concluded, based on *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 57 L.Ed.2d 424 (1977), and *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12

L.Ed.2d 246 (1964), that Forman's Sixth Amendment rights had been violated.[6] Consequently, Forman's habeas petition was conditionally granted, and a new trial was ordered.

## II.

■ This Court has not previously determined whether the standards of *Fay v. Noia, supra,* or *Wainwright v. Sykes, supra,* govern the availability in a habeas corpus challenge of a constitutional claim not raised on direct appeal from a state court conviction. The issue was noted in *Gale v. Harris,* 580 F.2d 52, 53 n. 1 (2d Cir. 1978), *cert. denied,* 440 U.S. 965, 99 S.Ct. 1515, 59 L.Ed.2d 781 (1979), but its resolution was not necessary for decision of that case.[7] This appeal poses the issue directly because there was no deliberate by–pass and hence petitioner's constitutional claim would be available under *Noia* but, as will appear, we conclude that his claim is not available under *Sykes.*

Both *Noia* and *Sykes* cast the issue in terms of waiver, but it is apparent that the two decisions assign different meanings to that concept. *Noia* uses the traditional test for determining waiver of a constitutional right, whether there has been "an intentional relinquishment or abandonment of a known right or privilege," *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), for determining whether a deliberate by–pass of an available state court remedy has occurred. 372 U.S. at 439, 83 S.Ct. at 849. *Sykes* shifts the inquiry away from an examination of the petitioner's knowledge and intention concerning assertion of his claim, and instead focuses on whether he in fact had a justifiable reason for not asserting his claim. In the absence of such a reason, the claim is deemed to be forfeited, regardless of whether the petitioner, or his counsel acting for him, consciously intended to waive a claim known to exist. Even if a justifiable reason exists, *Sykes* also deems the claim to be forfeited unless the petitioner can show that the failure to assert it caused him "actual prejudice." 433 U.S. at 91, 97 S.Ct. at 2508. We think the integrity of the term "waiver" will be better maintained in this context if it is used, as in *Noia,* to mean intentional relinquishment of a known right, and if the term "forfeiture" is used to describe what occurred in *Sykes,* where legal consequences were attached to a petitioner's omission. See *Indiviglio v. United States,* 612 F.2d 624, 630 n. 11 (2d Cir. 1979), *cert. denied,* 445 U.S. 933, 100 S.Ct. 1326, 63 L.Ed.2d 768 (1980); Spritzer, *Criminal Waiver, Procedural Default and the Burger Court,* 126 U.Pa.L.Rev. 473 (1978); Westen, *Away from Waiver: A Rationale for the Forfeiture of Constitutional Rights in Criminal Procedure,* 75 Mich.L. Rev. 1214 (1977).

Determining whether *Sykes* or *Noia* applies to this case requires some understanding of the evolution of the *Sykes* rule. Its origins trace back to the provisions of Rule 12 of the Federal Rules of Criminal Procedure, which require that specified objections and defenses be asserted in motions prior to trial and that failure to present such motions be deemed a "waiver" of those objections and defenses, unless the court grants relief from the "waiver" "for cause shown." In *Davis v. United States,* 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973), a federal prisoner sought to vacate his conviction under 28 U.S.C. § 2255 on the ground that there was racial discrimination

---

6. Forman also presented two other grounds for habeas relief. First, he claimed that the trial court's refusal to instruct the jury on criminally negligent homicide violated his right to a fair trial. Second, he claimed that permitting McClain not to answer certain questions during the hearing on the new trial motion, *see* note 4 *supra,* violated his right to compulsory process, and that admitting polygraph evidence violated his right under the Confrontation Clause. Forman does not renew these claims in resisting the State's appeal; in any event, we agree with the District Court's rejection of these claims, for the reasons stated in its opinion.

7. We have, however, noted the general limiting impact of *Sykes* upon *Noia. Gates v. Henderson,* 568 F.2d 830, 838 n. 6 (2d Cir. 1977) (*en banc*), *cert. denied,* 434 U.S. 1038, 98 S.Ct. 775, 54 L.Ed.2d 787 (1978); *id.* at 842–43 (Oakes, J., concurring).

in the selection of the grand jury that had indicted him. The Court ruled that the claim was not available on collateral attack because it had not been raised before trial as required by Rule 12. The Court specifically upheld the District Court's conclusion that no cause had been shown for the failure to comply with Rule 12, and approved the District Court's consideration of the absence of prejudice in determining whether a basis for relief from Rule 12 had been demonstrated. With respect to finding a lack of prejudice, the Court distinguished between the presumption of prejudice created by discrimination in jury selection, "which supports the existence of the right," and "actual prejudice," which must be shown to obtain relief from the provisions of Rule 12. *Davis v. United States, supra,* 411 U.S. at 245, 93 S.Ct. at 1584. Thus the "cause and prejudice" test for determining whether a claim was available on collateral attack came into existence.

In *Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976), a state prisoner sought federal habeas corpus relief under 28 U.S.C. § 2254, alleging discrimination in grand jury selection. Like Davis, Francis had not asserted his claim prior to trial as required by local procedure. The Court applied the *Davis* standard and held the grand jury discrimination claim to be unavailable in the federal habeas court. The significance of the progression from *Davis* to *Francis* was explicitly recognized in *Wainwright v. Sykes, supra,* when the Court observed, with respect to *Francis*: "As applied to the federal petitions of state convicts, the *Davis* cause–and–prejudice standard was thus incorporated directly into the body of law governing the availability of federal habeas corpus review." 433 U.S. at 85, 97 S.Ct. at 2505. *Sykes* then applied *Francis* and the cause and prejudice standard in determining that a state prisoner's challenge to the voluntariness of a confession was not available in federal habeas corpus review for failure to comply with a state's contemporaneous objection requirement.

In the case before us, the State's claim of forefeiture arises in circumstances that are not precisely like those in either *Noia* or *Sykes.* *Sykes* involved a failure to observe a state's procedural requirement at the trial level; this case involves an omission in the course of a direct appeal. *Noia* also involved an omission at the appellate level, but the omission was the failure to take any appeal, whereas the omission here is the failure to include in the appeal a particular claim—a challenge to the admissibility of Forman's post–arraignment statement. Superficially, the omission here may appear more similar to the one in *Noia* than the one in *Sykes,* but we do not think the choice of the applicable standard can be made on the basis of such rough procedural comparisons. Although *Sykes* did not explicitly overrule *Noia,* it specifically maintained as open the question whether the cause and prejudice standard of *Davis* and *Francis* should be applied to omissions at the appellate level. 433 U.S. at 88 n. 12, 97 S.Ct. at 2507, n. 12, 53 L.Ed.2d 594. Moreover, in outlining the relevant factors the court had considered in concluding that non–compliance at trial with a state procedural requirement precluded federal habeas review, the Court provided an analysis that is pertinent in resolving the unanswered question concerning default on appeal.

The four factors identified in *Sykes* were (1) comity: federal courts should respect state rules of procedure; (2) finality: the claim, if presented at trial, might have been dealt with in a way that disposed of either the claim itself or the entire case; (3) accuracy: the state trial, unlike federal habeas review, takes place a relatively short time after the events of the crime, when witnesses are available and memories are fresh; and (4) trial integrity: all issues should be fully aired at the trial, with no inducement for the defendant, or his attorney, to withhold certain issues in the hope of later obtaining a more favorable ruling from a federal court.

The first factor, considerations of comity, applies as forcefully to the observance of state appellate procedures as it does to those of state trials. Unless the procedure itself raises due process concerns, a state

has an obvious interest in having its appellate procedures maintained without circumvention in federal courts. Finality, the second factor, however, is not particularly relevant in this case. Forman's procedural default occurred after the trial was complete; the opportunity to resolve issues conclusively by submitting them to the finder of fact had already passed, and it thus makes no difference, as far as the finality of the trial is concerned, whether the trial outcome is reversed by a state appellate court or a federal habeas court.

In contrast, *Sykes'* third concern, accuracy, is highly relevant to a requirement that claims be presented on direct appeal. Since state remedies must be exhausted before habeas review can be obtained, state appellate review will generally occur much sooner after the trial than federal habeas review. In the present case, the state appeal in which the alleged forfeiture occurred was decided one year after the trial; the federal habeas proceeding, however, was held nearly five years after the trial, and relief was granted over six and one-half years after the trial. A time lag of that magnitude will clearly have a major impact on the availability and recollection of witnesses. The concern here is not only with the accuracy of fact–finding at a new trial; transcripts from a first trial can partially fill the void created by absent witnesses at retrial. But the concern for accuracy is especially forceful with respect to fact–finding into circumstances that were not developed at, or prior to, the first trial and that underlie the constitutional claim. Asserting the claim on direct review affords the state appellate court an opportunity to remand for a prompt hearing when needed to adjudicate the merits of the claim. See, e. g., *People v. Morhouse*, 21 N.Y.2d 66, 77–79, 233 N.E.2d 705, 711–12, 286 N.Y.S.2d 657, 665–67 (1967) (remand for evidentiary

hearing on whether court–ordered wiretap improperly issued and hence tainted prosecution's case and interfered with defendant's Sixth Amendment right to counsel).

The final factor considered in *Sykes*, trial integrity, also suggests that the *Sykes* cause and prejudice standard should be applied to forfeitures of constitutional claims on appeal. Although the interest in having all issues raised and fully discussed in a state appellate proceeding is less weighty than the interest in having all issues raised during a trial, which involves the assembling of witnesses and jurors, that interest remains substantial. Certainly, whatever the potential for abuse of the state proceeding by an attorney seeking a tactical advantage, this risk is as great at the appellate level as it is at the original trial.

Our review of the origins of the cause and prejudice standard and the reasons for its application in *Sykes* to forfeitures of specific claims at trial persuades us that that standard also applies to forfeitures of specific claims on appeal.[8] This conclusion has also been reached by the Fifth Circuit, *Evans v. Maggio*, 557 F.2d 430 (5th Cir. 1977), and by district courts within this Circuit, *United States ex rel. Hoover v. New York*, 469 F.Supp. 481 (S.D.N.Y.), aff'd on other grounds, 607 F.2d 1040 (2d Cir. 1979) (per curiam); *United States ex rel. Carbone v. Manson*, 447 F.Supp. 611 (D.Conn.1978); *Frazier v. Czarnetsky*, 439 F.Supp. 735 (S.D.N.Y.1977). We therefore proceed to apply the *Sykes* standard and examine whether there was cause for Forman's procedural default and whether prejudice resulted.

### III.

■ *"Cause."* The District Court concluded that Lt. Donovan's testimony at the *Huntley* hearing was a sufficient cause of

8. We need not decide whether the cause and prejudice standard would also apply to a state prisoner's failure to take any appeal from his conviction. Such a conclusion would mean that *Sykes* has effectively overruled *Noia*, as the Fifth Circuit concluded in applying *Sykes* to a case where the habeas petitioner had not appealed his conviction. *Sincox v. United*

States, 571 F.2d 876 (5th Cir. 1978). But it could be maintained that *Noia* still applies where the procedural default eliminates an entire stage of court proceedings, while *Sykes* applies to procedural defaults that abandon only a specific claim. Cf. *Boyer v. Patton*, 579 F.2d 284, 286 (3d Cir. 1978) (*Sykes* standard inapplicable to failure to take a direct appeal).

Forman's failure to assert a Sixth Amendment challenge to his post–arraignment statement on direct review of his conviction. At the hearing, Donovan had stated that the charges on which Forman had been arrested were unrelated to the murder charge. Though this statement was literally true, the District Court considered it misleading because, by omitting mention of the information filed the same day as the arrest, charging Forman with offenses related to the murder, it deflected Forman's counsel from developing the fact that Forman was represented by counsel on related charges at the time when he was questioned about the murder.

We can readily agree that any intentionally misleading statement by a state officer that obscures the opportunity to develop a federal constitutional violation would be "cause" for not pursuing such a claim on direct review. See Hill, *The Forfeiture of Constitutional Rights in Criminal Cases*, 78 Colum.L.Rev. 1050 (1978). Whether a misleading statement inadvertently made suffices is a closer question, and the issue is even more doubtful when the statement, like Lt. Donovan's, is literally true, although it may nevertheless have misled the petitioner's counsel. It would be especially strained to find cause in this case, when the facts as to which Forman's counsel was allegedly misled–what Forman had been charged with prior to the questioning and whether he had retained a lawyer on the related charges–were all matters within Forman's own knowledge. Even if Forman had only a vague idea as to the content of the charges brought against him at his arraignment, his mention of the arraignment to his trial counsel would have been sufficient to prompt inspection of the public record, which would have disclosed the relationship of those charges to the murder charge.

Moreover, even if Donovan's statement is considered misleading, it is by no means clear that the statement impaired development of Forman's federal claim. If the statement deflected trial counsel from developing the fact that Forman had retained counsel on charges related to the murder

charge on which he was questioned, that circumstance would clearly have impaired development of the state law claim that the admissions should have been suppressed because obtained in the absence of counsel. See *People v. Arthur, supra.* But that circumstance bears only the most tenuous relationship to trial counsel's ability to develop Forman's federal law claim. The federal claim is that Forman responded to questioning without making a valid waiver of his right to counsel. The Sixth Amendment does not preclude a waiver of that right in the absence of counsel. *Brewer v. Williams, supra,* 430 U.S. at 405–06, 97 S.Ct. at 1242–43. At the *Huntley* hearing trial counsel had a full opportunity to explore the circumstances surrounding Forman's alleged pre–questioning waiver of his right to counsel. It is arguable that the waiver claim might have been more fully litigated if trial counsel had known that prior to questioning Forman had exercised his right to counsel and had retained a lawyer. Though this might have elicited facts concerning Donovan's knowledge of whether Forman had retained counsel, it would not have altered counsel's opportunity to explore the basic facts of what Donovan said to Forman and what Forman responded before the questioning began. Thus, we doubt that Donovan's statement provided cause for not pursuing on direct appeal Forman's Sixth Amendment claim. Although we would not reach such a conclusion in the absence of further fact–finding as to precisely what opportunities Forman's trial counsel had to know and develop the facts necessary for presentation at the *Huntley* hearing and why he did not include the Sixth Amendment claim on appeal, we need not pursue the matter further because we conclude that Forman has not met the "prejudice" portion of the *Sykes* test.

*"Prejudice."* *Sykes* provides no more of a definition of "prejudice" than of "cause," but the Court has offered clues as to its meaning. Perhaps the most significant clue is the Court's selection of a term different from the "harmless error" standard of *Chapman v. California*, 386 U.S. 18, 87 S.Ct.

824, 17 L.Ed.2d 705 (1967), which might have been thought applicable in deciding whether to permit habeas corpus attack on claims not pursued, with just cause, in conformity with state court procedures. *Chapman* entitles the defendant to prevail unless the state can persuade a reviewing court that the error is harmless beyond a reasonable doubt. Clearly *Sykes* places the burden upon the petitioner to demonstrate the significance of the alleged error. What the petitioner must show to establish prejudice, however, is less certain. *Davis v. United States, supra,* makes clear, with reference to a grand jury discrimination claim, that the showing necessary to vacate a conviction on direct review, *Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), or on habeas corpus review, *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), will not suffice to secure habeas corpus relief when the discrimination claim has not been pursued in conformity with state procedural requirements. *Davis'* insistence on "actual prejudice" requires something more.

The requirement of an enhanced showing of prejudice in cases governed by *Sykes* stems from the nature of the state's interest in maintaining the conviction. When a meritorious claim of constitutional error is presented to state courts in conformity with their procedures and they fail to uphold the claim, the state interest involved is the interest in not having any retrial, even a prompt one. *Chapman* held that this interest cannot prevail unless it can be said with confidence that the constitutional error was harmless. But when the claim is not presented in conformity with state procedures, additional state interests arise. Chief among these is the state's significant interest in making sure that if a retrial is required, it takes place without delay. Unless the constitutional error caused actual prejudice, the state should not have to bear the risk of a reduced chance of conviction resulting from retrial years after the first trial.

The principal focus of the actual prejudice standard is upon the significance of the evidence admitted as a result of the constitutional error in relation to all the other evidence in the case. Forman's statement, which Judge Curtin determined to have been obtained in violation of his Sixth Amendment rights, claimed that Gilliland had been shot when Forman's rifle accidentally discharged while being passed between Forman and another man. In assessing the prejudicial impact of this statement, Judge Curtin noted that it placed Forman at the scene of the homicide, it involved him in the death to some degree, and it acknowledged his ownership of the rifle. Even standing alone, though it has the probative force Judge Curtin noted, the statement is primarily evidence of negligent homicide, rather than the murder of which Forman was convicted. But in the context of the evidence at trial, the significance of the statement in tending to prove Forman's guilt of the murder charge is markedly diminished. Other evidence amply connected Forman to the weapon. Williams testified he had seen Forman purchase the rifle, and Harris testified that Forman had given him the rifle on the morning after the murder. As to Forman's presence at the scene of the crime, his wife testified that she saw him there with the murder weapon in his hands. More significantly, while Forman's statement was exculpatory as to the offense of murder, other evidence was strongly probative of guilt. Walton testified that she heard Forman threaten to shoot the victim in retaliation for a prior shooting episode, and, most important, two witnesses, Harris and Williams, testified that Forman told them that he had shot Gilliland. In the context of the overwhelming evidence of guilt, Forman's statement attempting to minimize his culpability was not a source of actual prejudice.

The inquiry concerning actual prejudice focuses in addition upon the nature of the constitutional error and its relation to the reliability of the evidence adduced at trial. In *Francis v. Henderson, supra,* the Supreme Court declined to find actual prejudice simply from the fact of racial discrimination in grand jury selection. In *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49

L.Ed.2d 1067 (1976), the Court concluded that since Fourth Amendment violations do not impair the reliability of evidence unlawfully obtained, such violations would never be grounds for habeas corpus relief so long as the petitioner had a full and fair opportunity to litigate his claim in the state courts. A Sixth Amendment violation can, of course, have a profound effect on the reliability of the fact–finding process when the right to counsel is denied at trial. But when, as in this case, the right is allegedly denied because post–arraignment questioning occurred without a valid waiver of the right to counsel, the effect on reliability is less certain. There is no basis for believing that the circumstances of Forman's questioning were coercive. It is true that counsel's presence, if it did not prevent questioning, would tend to lessen disputes over what the defendant said. But in this case, Forman did not dispute Lt. Donovan's report of the statement. Instead Forman acknowledged he had made the statement, but claimed he had lied in order to protect his wife.

We do not doubt that in some cases the denial of the right to counsel during post–indictment questioning will be relevant to the reliability of the defendant's responses. The relationship will vary according to the circumstances of the case. Thus, unlike Fourth Amendment violations, this type of constitutional error will not always be irrelevant to the reliability of the fact–finding process. But neither will it necessarily create the serious risks of error inherent in constitutional claims alleging coercive interrogation or suggestive eyewitness identification. In this case there is no reason to believe that the nature of the alleged constitutional error added any concern about reliability that might enhance an attempt to show actual prejudice.

In sum, we do not agree with the District Court that Forman has met the standard that would permit a federal court to grant habeas corpus relief for a claim that the state courts have explicitly found was forfeited when it was not pursued on direct review. The judgment granting a conditional writ and ordering a new trial is therefore reversed.